UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| VICTOR M. SANTIAGO, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 4:09CV933 HEA |
| | ) | |
| DANIEL BLAIR, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## OPINION, MEMORANDUM AND ORDER

This matter is before the Court on Defendants' Motion for Summary Judgment, [Doc. No. 119]. Plaintiff opposes the Motion, and the issues are fully briefed. For the reasons set forth below, the Motion is denied.

## Introduction

Plaintiff filed this action *pro se*. Plaintiff's Amended Complaint alleges claims pursuant to 42 U.S.C. § 1981. Plaintiff's first claim in the amended complaint alleges Defendants Blair, Williford, Fox, and Parsons violated his Eighth Amendment right to be free from cruel and unusual punishment by their alleged use of excessive force. Plaintiff's second claim alleges that Defendant Branch was deliberately indifferent to his serious medical needs. The Amended Complaint alleges that Defendants Clubbs and Branch violated his First Amendment rights by retaliating against him for filing grievances regarding the Eighth Amendment

Claims.  Plaintiff's claims are brought against Defendants in their individual and official capacities.

Defendants now move for summary judgment.  Defendants argue that Plaintiff's official capacity claims are barred by the Eleventh Amendment; they are entitled to qualified immunity on the individual capacity claims; and, alternatively, they are entitled to summary judgment based on the absence of any disputed genuine facts.

## Facts and Background

Defendants have submitted a Statement of Uncontested Facts in support of their Motion for Summary Judgment.  In response, Plaintiff has submitted a "Statement of Contested Facts" and has set forth his "disputes" as to each of Defendants' Uncontested facts.  Defendants have submitted their affidavits and Plaintiff has submitted his affidavit and the declaration of his mother, with regard to the facts underlying this action.

Defendants' version of the events is as follows:  On July 25, 2008, Defendants Blair, Williford, Fox, Parsons, and Branch were employed by the Missouri Department of Corrections at Potosi Correctional Center in Mineral Point, Missouri.  On the morning of July 25, 2008, Defendant Blair learned that Plaintiff was supposed to be at work in the kitchen but that he had not shown up

- 2 -

for work. When an offender doesn't show up for work, there is a high safety and security risk, as the offender may be attempting to escape or may be in trouble or causing trouble. COI Nash contacted Defendant Blair to let him know that Plaintiff had been found in the Recreation Area and that Nash was sending Plaintiff on his way to the food service area. Defendant Blair proceeded to the food service area to speak with Plaintiff about his rule violation for not showing up to work. Sgt. Hunter and COI Nash were also present.

Defendant Blair informed Plaintiff that he was going to get locked up for his failure to show up for work, as this caused a large disturbance in 6 House and in the Recreation Area while staff members were looking for Plaintiff. Defendant Blair instructed COI Nash to escort Plaintiff to the strip out room in the food service area so that Plaintiff could remove his work clothes and boots. Plaintiff seemed to be taking a long time to remove his work clothes and boots, so Defendant Blair walked to the strip out room. When he got to the strip out room, Defendant Blair saw Plaintiff inside the strip out room, naked, in a defensive stance. Plaintiff was spitting on the floor and threatening Nash, yelling that he was not going anywhere and that he was going to harm Nash and Defendant Blair.

Defendant Blair attempted to calm Plaintiff by speaking to him. Plaintiff continued to threaten Nash and Defendant Blair. To prevent the situation from

becoming violent, Defendant Blair attempted to call a 10-5 on his radio, letting staff at PCC know that assistance was needed.  Defendant Blair's radio was not functioning.  Defendant Blair looked to COI Nash, who decided to make the 10-5 call.

Defendants Williford, Fox, and Parsons responded to the 10-5 call, along with other correctional officers.  Defendant Blair ordered Plaintiff to submit to wrist restraints.  Plaintiff did not comply with the request to submit to wrist restraints, but instead faced Defendant Blair with both hands clinched to form a fist and stated that he was going to knock Defendant Blair out.  Defendant Blair told Plaintiff that numerous staff members were on their way in response to the 10-5 and that it would look better for him if he were in handcuffs when they arrived. Finally, Plaintiff complied with the request to submit to handcuffs. Defendant Blair placed wrist restraints on Plaintiff.  Defendant Blair claims he did not tighten the handcuffs to the crushing point and did not state to Plaintiff, "let me lock the safety, we wouldn't want them to accidentally tighten on you," as Plaintiff claims.

After placing Plaintiff in wrist restraints, several staff members began to arrive.  Defendant Williford observed Plaintiff walk out of the strip out room in the back of the kitchen area and into the main kitchen.  At this time, Defendant

- 4 -

Williford escorted Plaintiff to the medical unit.  It is standard procedure that before an offender is sent to temporary administrative segregation confinement, or TASC, an offender is to be seen by the medical staff.

Defendant Williford placed his right hand on Plaintiff's left bicep and elbow area and escorted Plaintiff to the medical unit.  Williford claims to have handled Plaintiff with a soft empty hand escort, and that he did not threaten or verbally harass Plaintiff while escorting him.  Defendant Williford further claims that he did not dig his fingers into the bicep muscle of Plaintiff's left arm.  Defendant Williford avers that he did not ask Plaintiff, "what are you going to do about it, tough guy?"

During the escort, Williford claims Plaintiff was cussing at him, threatening Defendant Williford, and yelling at Defendant Williford.  Defendant Williford was about to use his radio to make a radio transmission to state that he was escorting Plaintiff to the medical unit. At that point, Williford, Fox and Spain all aver that Plaintiff jerked away and attempted to break free of the escort.  Defendant Williford then turned Plaintiff around and forcefully placed him against the wall in an attempt to maintain control of him.  According to Williford, Plaintiff began throwing his head back at Defendant Williford several times in an attempt to head butt Defendant Williford with the back of his head. Plaintiff threw his head back

- 5 -

at least five times, and landed at least one blow on Defendant Williford's nose and face.  To maintain control of Plaintiff and the escalating situation, Defendant Fox had to apply a short burst of pepper spray to Plaintiff's face. When COI Fox applied pepper spray to Plaintiff's face, Defendant Williford was also pepper sprayed in the face Plaintiff's continuing resistance presenting a safety and security risk to the officers and to Plaintiff.  Several correctional officers were behind when Plaintiff was attempting to head butt Defendant Williford, and these officers assisted in attempting to place Plaintiff on the ground. Plaintiff was struggling while correctional officers and Defendant Williford attempted to place him on the ground to maintain control of him.  After Defendant Fox utilized his pepper spray, other correctional officers and Defendant Williford continued to place Plaintiff on the floor in an effort to maintain control of him. They placed Plaintiff face down on the floor and maintained control of him.

While staff members sought to restrain Plaintiff on the floor, Defendant Parsons stepped in and assisted with the situation. Plaintiff was on the ground, lying on his stomach. Defendant Parsons held Plaintiff's legs at the feet, crossed his feet, folded his legs at the knees, and pressed his ankles to his thigh and buttock area.  Defendant Parsons held Plaintiff's legs down until they were secured with leg restraints in an effort to restrain Plaintiff.

- 6 -

Defendant Williford continued to assist in maintaining control of Plaintiff on the floor until leg restraints were applied to Plaintiff. Defendant Williford then relinquished control of Plaintiff to other correctional officers, as Defendant Williford was the person that had been allegedly assaulted by Plaintiff. Correctional Officer Robert Spain brought leg restraints to Defendant Parsons. Defendant Parsons applied leg restraints to Plaintiff's leg. After leg restraints were applied to Plaintiff's legs, Defendant Parsons assisted other officers in escorting Plaintiff to the medical unit, where Plaintiff needed to go per institutional policy following a spontaneous use of force. Defendant Parsons placed his arms under the upper arm and shoulder area of Plaintiff's left side. In the medical unit, there were other staff members present, along with the medical officer and infirmary nurses. Plaintiff asked if he could have his wrist restraints loosened. Those in charge of his medical treatment and care determined that Plaintiff did not need his wrist restraints loosened.

Defendant Parsons observed the Correctional Medical Services (CMS) nurse evaluate Plaintiff. After the evaluation, Defendant Parsons assisted with escorting Plaintiff to Housing Unit 1.

Defendant Fox observed staff members help Plaintiff up from the floor and escort him down the hall. Defendant Fox followed Plaintiff and the staff members

escorting him to the medical unit. While in the medical unit, Defendant Fox observed the Correctional Medical Services (CMS) nurse assigned there evaluate Plaintiff and state that he was ok.

Plaintiff's medical records following the spontaneous use of force show that Plaintiff had a "small laceration with bleeding easily controlled on back of left wrist."  Plaintiff did not complain of difficulty breathing or of other injuries. Plaintiff verbalized understanding of care and instructions.  Plaintiff was not crying, withdrawn, hostile, or angry.  The nurse's assessment concerning pepper agent states that Plaintiff was given the opportunity to wash his face.

Defendant Fox and another officer took Plaintiff to the shower area, where he was allowed to rinse his face.  After Plaintiff washed his face, Defendant Fox and another officer proceeded to escort Plaintiff to 1 House.  1 House is one of two administrative segregation housing units at PCC.  There are twenty-four cells in 1 House.  The majority of offenders who have assaulted staff or other inmates are taken to 1 House following their assaults.

Defendant Williford went to the medical unit to get his eyes washed, as Defendant Williford had been pepper sprayed and could not see well.  Defendant Williford walked in to the medical unit and Plaintiff and the other correctional officers were there.  Someone told Defendant Williford to get out because Plaintiff

was there and they were to be separated per institutional policy, so Defendant

Williford went to another part of the medical unit where he washed his eyes.

A couple of hours later, Defendant Williford saw Plaintiff when Defendant

Williford visited him to read his conduct violation to him.  Plaintiff was issued a

conduct violation report for assaulting an officer, threats, and creating a

disturbance.

After the staff members had maintained control of Plaintiff, Defendant Blair

immediately went to the custody complex where he gave an oral report to Captain

Branch. The walk to the custody complex probably took about three minutes.

After giving an oral report to Captain Branch, Defendant Blair went to his office,

which is next to Captain Branch's, and wrote a written report of the situation. It

took Defendant Blair about forty minutes to write the report, editing it and

correcting it. Captain Branch was in his office for the first part of this, twenty

minutes, at least.

Plaintiff filed an informal resolution request, offender grievance, and

grievance appeal against Defendants Blair, Williford, Fox, and John Doe (later

identified as Parsons) concerning the spontaneous use of force on July 25, 2008.

An internal review by the Deputy Division Director of the Missouri Department of

Corrections concluded that "the amount of force employed against [Plaintiff] on

7/25/08 was that minimally necessary to control the incident and maintain good order and security of the institution."   Plaintiff's request for financial compensation was denied.

Plaintiff also filed an informal resolution request, offender grievance, and grievance appeal contending that he was not guilty of the conduct violation issued to him for Rule 2.1-Assault (on staff).  An internal review by the Deputy Division Director of the Missouri Department of Corrections concluded that the evidence, including Plaintiff's own admissions, showed that Plaintiff "did in fact attempt to cause serious physical injury to COI Williford on 7/25/08."  Plaintiff's requests regarding the violation and Defendant Williford were denied.

On July 25, 2008, Defendant Branch was employed by the Missouri Department of Corrections at Potosi Correctional Center.  On that date, Defendant Branch was in his office in the housing complex in Potosi Correctional Center when Lt. Blair entered his office to give an oral report concerning the spontaneous use of force on Plaintiff.  After Lt. Blair gave his oral report, Defendant Branch observed Lt. Blair enter his office, which is next to Defendant Branch's office, and begin writing his written report regarding the spontaneous use of force on Plaintiff.  Defendant Branch was not present for the spontaneous use of force on Plaintiff and was not in the medical unit following the spontaneous use of force on

- 10 -

Plaintiff on July 25, 2008.   As a correctional officer, Defendant Branch does not render medical treatment or care to offenders housed in the prison facility.  The Missouri Department of Corrections has a contract with a private industry named Correctional Medical Services and their employees provide medical treatment and care to offenders housed in a Missouri Department of Corrections facility.

Plaintiff was seen again by a medical doctor on August 22, 2008.  Plaintiff's medical records from that date state that his left wrist had full active range of motion, was non-tender, and had a grip of 5/5.  Further, the subjective notes state that Plaintiff was not complaining of pain in the left wrist or of sensory/motor loss.

Plaintiff was seen by a medical nurse on September 30, 2008, for grinding pain in his right hip caused by a past motorcycle accident.  At that time, Plaintiff did not complain about any of the injuries listed in Plaintiff's Amended Complaint.

Plaintiff was seen by a medical doctor for his hip pain on October 1, 2008.  Plaintiff did not complain about any of the injuries listed in Plaintiff's Complaint.

On January 13, 2009, Plaintiff was seen by a medical doctor and complaint of blurry vision and pain in his left eye, claiming that this was from the application of pepper spray by Defendant Fox.  The medical doctor's stated plan for Plaintiff was to "change glasses – UPDATE."  On February 18, 2009, Plaintiff was seen by a medical nurse, where Plaintiff was "issued state glasses and offender turned in

- 11 -

old glasses."

In February, 2009, Defendant Clubbs was employed by the Missouri
Department of Corrections as a Correctional Officer at Potosi Correctional Center
in Mineral Point, Missouri.  At that time, Defendant Clubbs avers that he did not
tell Plaintiff "I know those guys," that Plaintiff "would be smart to just drop it,"
that "if you know what is good for you, you will leave Lt. Blair out of it," "maybe
a couple more years in the hole will knock that tough ass attitude out
of you, I can make that happen or maybe we'll find you hanging in one of these
cells," or "think about it," as Plaintiff claims.

On March 2, 2009, Defendant Clubbs was working as a COI in the
administrative segregation confinement unit.  During lunch time, another officer
and Defendant Clubbs were distributing trays to offenders housed in the
administrative segregation confinement unit. Plaintiff was in a cell in the
administrative segregation confinement unit.   At the end of lunch, the other
officer and Defendant Clubbs went around to the cells to pick up the trays.
Defendant Clubbs came to Plaintiff's cell and saw that Plaintiff's cell had one or
two sheets tied up and jammed into the crack in the bottom of the door, which is
against institutional policy.  Defendant Clubbs attempted to remove the sheets
through the side of the door but the sheets were tied at the end and couldn't get

them out.  When Plaintiff saw that Defendant Clubbs was attempting to remove

the sheets, he got a hold of the sheets and pulled back while Defendant Clubbs

was pulling.  According to Defendant Clubbs, he let go of the sheets when

Plaintiff pulled back on them. As Defendant Clubbs let go, Plaintiff's momentum

caused Defendant Clubbs' hand to make contact with the cell door.  Defendant

Clubbs then gave Plaintiff several orders to throw the sheets out of his cell through

the food port door.  Clubbs avers that Plaintiff did not obey these orders, but

began calling Defendant Clubbs lots of names, cussing, hollering, screaming, and

threatening Defendant Clubbs.  Plaintiff then began throwing trash out of the food

port door.   Defendant Clubbs reached down and tried to shut the food port door

with his hand.  Plaintiff hit the food port door, causing the solid steel slab door to

fall and hit Defendant Clubbs' left hand.  After the food port door hit his left hand

Defendant Clubbs jerked his hand back and then stepped back from Plaintiff's cell

door. Defendant Clubbs then contacted Sergeant Huffman, the Sergeant on duty

that day.

Sergeant Huffman arrived soon after. Sergeant Huffman told Plaintiff to

stop throwing things and to calm down.  Defendant Clubbs observed Plaintiff

submit to wrist restraints.  Defendant Clubbs observed correctional officers escort

Plaintiff to B wing.  After that, Defendant Clubbs went to medical to get his hand

checked.

Defendant Clubbs wrote a conduct violation report for Plaintiff's actions which placed Plaintiff in violation of Rules 2.1, 12.1, 19.1, and 20.1

Plaintiff was moved the following day to a cell that had a mattress and a working sink and toilet.  Plaintiff filed an informal resolution request, grievance, and grievance appeal requesting Potosi Correctional Center, (PCC), to allow him to re-file an informal resolution request on Defendant Clubbs for allegedly falsifying a conduct violation report.  An internal review by the Deputy Division Director of the Missouri Department of Corrections found that there was no evidence that PCC staff received the informal resolution request from Plaintiff or that PCC staff was negligent in processing or responding to such.

On March 12, 2009, Plaintiff was seen by a medical nurse for a hearing impairment card verification, stating that "I had this done at Fulton in '96."

In his affidavit, Plaintiff disputes the facts stated above.  Plaintiff avers that he was not combative, was not spitting on the floor nor did he refuse orders.  Plaintiff further avers that Defendant Blair did not attempt to calm him; that Defendant Blair stated that he would "kick Plaintiff's ass."  Plaintiff further avers that it was at this point that Plaintiff assumed a defensive position.  Plaintiff avers that Blair grabbed his left hand and forced the handcuff onto his wrist, and stated,

"let me lock the safety, we wouldn't want them to accidentally tighten on you."

With respect to Defendant Williford, in his affidavit, Plaintiff avers that Williford swung him in an arc, to his left, face first toward a brick wall. He was slammed into the wall, striking it with the right side of his body. Plaintiff denies striking Defendant Williford. Plaintiff avers he offered no resistance of any kind.

Likewise, Plaintiff denies the fact stated that Fox applied a short burst of pepper spray to maintain control of Plaintiff and the escalating situation. Plaintiff maintains that he offered no resistance; that he did not attempt to headbutt Williford; and that he was not struggling with the officers. Plaintiff avers he was slammed face first on the ground. Additionally, in his affidavit, Plaintiff disputes Defendants' rendition of the facts. Plaintiff avers that while he was handcuffed, incapacitated by chemical mace, and lying face down on the floor with several Correctional Officers' knees on his neck and back, he felt Defendant Parsons take hold of Plaintiff's right foot and bend his right leg up and onto his lower back. Twisting his right foot in a torque motion.

Plaintiff further avers that Defendant Parsons grasped Plaintiff's left hand and bent it up sharply, dislocating his left wrist. Plaintiff avers that he informed the attending nurse that his left wrist had been dislocated ant that he had lost all feeling in that hand. The nurse asked Parsons to loosen the handcuff, and Parson

- 15 -

responded that Plaintiff was "fine."

Plaintiff disputes the medical record. He presents his mother's declaration of her observations of his injuries. Plaintiff's mother declares that she observed a swollen and immobile left wrist; lacerations to both sides of Plaintiff's left wrist; finger point contusions to the front and back side of Plaintiff's upper left arm; swollen and bloodshot eyes; a knot and bruising above Plaintiff's right eye; a large bruise above Plaintiff's right elbow; and bruising to the right side of Plaintiff's back and hip.

Plaintiff also challenges Defendants' rendition of the facts regarding the medical visit. Plaintiff avers that the nurse informed Defendant Branch that Plaintiff needed to be placed in a shower to remove the mace, and that Branch responded that they should "leave him, maybe he'll think twice before he threatens one of us." Plaintiff claims he was taken to the shower "some thirty five minutes after being sprayed with chemical mace,. . . [a]nd allowed no more than thirty seconds in the shower." Plaintiff further avers that, contrary to Defendant Branch's affidavit, the statement that Branch was not present in the medical unit while Plaintiff received treatment is inaccurate.

Plaintiff claims to have told the nurse that his left wrist was dislocated. Plaintiff disputes the medical record as "proof" of medical treatment for his wrist.

Plaintiff testified that he was forced to reset his dislocated left wrist himself, using a sock and the handicapped assistance bar in his cell.

Plaintiff further disputes Defendants' affidavits through his own.  He avers that Clubbs threatened his life, and that Clubbs indicate that he would make Plaintiff's death appear as a suicide. He also disputes Clubbs' rendition of the encounter at the food port.  Plaintiff denies having done any of the acts detailed by Defendants.

<u>Discussion</u>

**Summary Judgment Standard**

The standards for summary judgment are well settled.  In determining whether summary judgment should issue, the Court must view the facts and inferences from the facts in the light most favorable to the nonmoving party.  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Woods v. DaimlerChrysler Corp.,* 409 F.3d 984, 990 (8th Cir. 2005); *Littrell v. City of Kansas City, Mo.,* 459 F.3d 918, 921 (8th Cir. 2006).  The moving party has the burden to establish both the absence of a genuine issue of material fact and that it is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c);  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986);  *Enterprise Bank v. Magna Bank*, 92 F.3d 743, 747 (8th Cir.

- 17 -

1996).  Once the moving party has met this burden, the nonmoving party may not

rest on the allegations in his pleadings but by affidavit or other evidence must set

forth specific facts showing that a genuine issue of material fact exists.  Fed. R.

Civ. P. 56(e); *Anderson* 477 U.S. at 256;  *Littrell* , 459 F.3d at 921.  "The party

opposing summary judgment may not rest on the allegations in its pleadings; it

must 'set forth specific facts showing that there is a genuine issue for trial.'"

*United of Omaha Life Ins. Co. v. Honea,* 458 F.3d 788, 791 (8th Cir.2006)

(quoting Fed. R. Civ. P. 56(e)); "'Only disputes over facts that might affect the

outcome of the suit under the governing law will properly preclude the entry of

summary judgment.'"  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).

*Hitt v. Harsco Corp.,* 356 F.3d 920, 923 (8th Cir. 2004).  An issue of fact is

genuine when "a reasonable jury could return a verdict for the nonmoving party"

on the question.  *Anderson,* 477 U.S. at 248; *Woods,* 409 F.3d at 990.

To survive a motion for summary judgment, the "nonmoving party must

'substantiate his allegations with sufficient probative evidence [that] would permit

a finding in [his] favor based on more than mere speculation, conjecture, or

fantasy.'"  *Wilson v. Int'l Bus. Mach. Corp.*, 62 F.3d 237, 241 (8th Cir.

1995)(quotations omitted).  *Putman v. Unity Health Sys.*, 348 F.3d 732, 733-34

(8th Cir. 2003).  A party may not merely point to unsupported self-serving

- 18 -

allegations, but must substantiate allegations with sufficient probative evidence that would permit a finding in the plaintiff's favor. *Wilson v. Int'l Bus. Mach. Corp.,* 62 F.3d 237, 241 (8th Cir.1995). "The mere existence of a scintilla of evidence in support of the [party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson,* 477 U.S. 242 at 252; *Davidson & Assocs. v. Jung* 422 F.3d 630, 638 (8th Cir. 2005) Summary judgment is proper if a plaintiff fails to establish any element of the prima facie case. *Nesser v. Trans World Airlines, Inc.*, 160 F.3d 442, 444 (8th Cir. 1998) (citing *Weber v. American Express Co.*, 994 F.2d 513, 515-16)). "Mere allegations, unsupported by specific facts or evidence beyond the nonmoving party's own conclusions, are insufficient to withstand a motion for summary judgment." *Thomas v. Corwin,* 483 F.3d 516, 526-27(8th Cir. 2007). Summary judgment will be granted when, viewing the evidence in the light most favorable to the nonmoving party and giving the nonmoving party the benefit of all reasonable inferences, there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. *Samuels v. Kan. City Mo. Sch.Dist.,* 437 F.3d 797, 801 (8th Cir. 2006).

**Eleventh Amendment**

Defendants argue that Plaintiff's official capacity claims are barred by the

Eleventh Amendment.  The Court agrees.

The Eleventh Amendment provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State."  United States Constitution, Amendment XI.  In effect, the Eleventh Amendment immunizes from suit a "state agency or official * * * if immunity will 'protect the state treasury from liability that would have had essentially the same practical consequences as a judgment against the State itself.'" " *Hadley v. North Arkansas Community Technical College*, 76 F.3d 1437, 1438 (8th Cir.1996), quoting *Pennhurst State Sch. & Hosp. v.. Halderman*, 465 U.S. 89, 123 n. 34 (1984); see also, *Regents of the University of California v. Doe*, 519 U.S. 425, 429 (1997); *Edelman v. Jordan*, 415 U.S. 651, 652-53 (1974); *Ford Motor Co. v. Department of Treasury,* 323 U.S. 459, 464 (1945), overruled on other grounds, *Lapides v. Board of Regents of University System of Georgia*, 535 U.S. 613, 614-15 (2002).

The Eleventh Amendment bars actions, in Federal Court, which seek monetary damages from individual State Officers, in their official capacities, as well as State Agencies, because such lawsuits are essentially "for the recovery of money from the state." *Ford Motor Co.,* supra 464; see also, *Will v. Michigan*

*Dep't of State Police*, 491 U.S. 58, 71 (1989)( "[N]either a State nor its officials acting in their official capacities are 'persons' under § 1983" when sued for damages.).

In an action under Title 42 U.S.C. § 1983, a public servant may be sued in an official, or in an individual capacity, or both. See, *Johnson v. Outboard Marine Corp*., 172 F.3d 531, 535 (8th Cir.1999). The Eleventh Amendment protects the State, and the arms of the State, from liability for monetary damages in a Section 1983 action. See, *Hadley v. North Arkansas Community Technical College*, 76 F.3d 1437, 1438 (8th Cir.1996), cert. denied, 519 U.S. 1148 (1997)(a State Agency or its officials may invoke Eleventh Amendment immunity, if the practical result of a suit would result in judgment against the State itself).  Such immunity also extends to State officials, who are named as individual defendants acting in their official capacities. *Id*. When the action is against the office and not the person, there is no difference from a suit against the State itself. See, *Hafer v. Melo*, 502 U.S. 21, 25-26 (1991); *Will*, *supra* at 71.

Plaintiff has sued all of the Defendants in their individual and official capacities.  Plaintiff has alleged no basis for any purported waiver, by the State of Missouri, of Eleventh Amendment immunity, and the Court's independent review does not disclose any.  Therefore, the official-capacity claims against the

Defendants in which the Plaintiff seeks damages will be dismissed.

**Qualified Immunity**

Defendants argue that the Plaintiff's claims against them for damages, in their individual capacities, are barred by the doctrine of qualified immunity. Government officials, who are performing discretionary functions, are generally shielded from liability for civil damages, unless their conduct violates clearly established statutory or constitutional rights of which a reasonable person would have known. See, *Wallingford v. Olson*, 592 F.3d 888, 891 (8th Cir.2010); *Wilson v. Layne*, 526 U.S. 603, 609 (1999); *Young v. Harrison*, 284 F.3d 863, 866 (8th Cir.2002); *Winters v. Adams*, 254 F.3d 758, 766 (8th Cir.2001).

"[W]hether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the 'objective legal reasonableness' of the action, assessed in the light of the legal rules that were 'clearly established' at the time it was taken." *Wilson*, at 614.  The contours of the constitutional right at issue "must be sufficiently clear that a reasonable official would understand that what he is doing violates that right," but "[t]his is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful; but it is to say that in light of pre-existing law, the unlawfulness must be apparent." *Anderson v.*

- 22 -

*Creighton*, 483 U.S. 635, 641 (1987).  As a consequence, "[t]he doctrine 'gives ample room for mistaken judgments but does not protect the plainly incompetent or those who knowingly violate the law.'"  *Bagby v. Brondhaver*, 98 F.3d 1096, 1098 (8th Cir.1996).

In determining whether a public official has violated a clearly established constitutional right, the reviewing Court has discretion to determine which prong of the two-part test to address first. See, *Heartland Academy Community Church v. Waddle*, 595 F.3d 798 (8th Cir. 2010), citing *Pearson v. Callahan*, --- U.S. ----, 129 S.Ct. 808, 818 (2009).

The party asserting immunity always has the burden to establish the relevant predicate facts, and at the summary judgment stage, the nonmoving party is given the benefit of all reasonable inferences. In determining whether an officer is entitled to qualified immunity, the Court asks: (1) whether, taking the facts in the light most favorable to the injured party, the alleged facts demonstrate that the official's conduct violated a constitutional right; and (2) whether the asserted constitutional right is clearly established. The Court may address either question first. If either question is answered in the negative, the public official is entitled to qualified immunity. To determine whether a right is clearly established the Court asks whether it would be clear to a reasonable officer that his conduct was

- 23 -

unlawful in the situation he confronted. *Wallingford v. Olson*, 592 F.3d at 892
(internal citations and quotations omitted).

Plaintiff has alleged that Defendants used excessive force in dealing with
the situation following Plaintiff's failure to report to his work assignment and that
Defendants were deliberately indifferent to his serious medical needs. Defendants
cannot contend that the right to be free from excessive force and deliberate
indifference to serious medical needs was not clearly established at the time of
incident. "Since the surrounding factual circumstances are in dispute, material
questions of fact prevent granting summary judgment on the basis of qualified
immunity ." *Nance v. Sammis*, 586 F.3d 604, 611 (8th Cir.2009).

The record before the Court establishes that Plaintiff's version of the events
is diametrically opposed to Defendants'.  Construing the record in the light most
favorable to Plaintiff, the Court finds Defendants are not entitled to qualified
immunity.  It is not this Court's role nor duty to ascertain the credibility of the
parties in this matter.

**Excessive Force**

The right to be free from excessive force is a clearly established
right under the Fourth Amendment's prohibition against unreasonable
seizures of the person." *Guite v. Wright*, 147 F.3d 747, 750 (8th
Cir.1998).  "Not every push or shove ... violates the Fourth
Amendment," but force is excessive when the officers' actions are not
"objectively reasonable in light of the facts and circumstances

- 24 -

confronting them." *Graham v. Connor*, 490 U.S. 386, 396-97 (1989)
(internal quotation marks and citations omitted); see *Kukla v. Hulm*,
310 F.3d 1046, 1050 (8th Cir.2002). Objective reasonableness
depends on the facts and circumstances of the case, "'including the
severity of the crime at issue, whether the suspect poses an immediate
threat to the safety of the officers or others, and whether he is actively
resisting arrest or attempting to evade arrest by flight.'" *Mann v.
Yarnell*, 497 F.3d 822, 825-26 (8th Cir.2007) (quoting *Graham*, 490
U.S. at 394. "A court may also evaluate the extent of the suspect's
injuries." *Mann*, 497 F.3d at 826.

*Rohrbough v. Hall*, 586 F.3d 582, 585-586 (8th Cir.2009).

## Deliberate Indifference

In order to prevail on his deliberate indifference claim, Plaintiff must

demonstrate that he had an objectively serious medical need that was "either

obvious to the layperson or supported by medical evidence, like a physician's

diagnosis." *Grayson v. Ross*, 454 F.3d 802, 809 (8th Cir.2006) ( quoting *Aswegan

v. Henry*, 49 F.3d 461, 464 (8th Cir.1995)).  While Defendant Branch cites to

Plaintiff's medical records following the incident to establish a lack of genuine

issues as to the material facts surrounding Plaintiff's claims of deliberate

indifference, Plaintiff counters with his affidavit and his mother's declaration.

Giving Plaintiff the benefit of all reasonable inferences, Plaintiff's opposition

raises an issue as to whether Plaintiff's condition was obvious to a lay person.  As

previously noted, this Court's function is not to ascertain the veracity of the

witnesses, rather, the Court must determine whether genuine issues of material fact

- 25 -

exist.  As such, the motion for summary judgment must be denied.

**Retaliation**

Likewise, with respect to Plaintiff's claims of retaliation, Plaintiff has presented his affidavit that his life was threatened and that the conditions of his incarceration were extremely unpleasant for a day.  While Plaintiff's placement alone may be insufficient to establish a retaliation claim, the Court has grave concerns regarding the alleged threats and the impact those threats would have on Plaintiff's mental status, as well as the purpose behind the alleged threats Accordingly, summary judgment is not appropriate.

<u>Conclusion</u>

Based upon the foregoing, the claims against Defendants in their official capacities are barred by the Eleventh Amendment, and will be dismissed. However, Defendants are not entitled to summary judgment on the remaining claims.  The record before the Court contains conflicting sworn testimony regarding the parties' actions.  The Court makes no determination as to the credibility of any of the parties or witnesses; credibility determinations are most assuredly within the purview of the finder of facts.

Accordingly,

**IT IS HEREBY ORDERED** that Defendants' Motion for Summary

Judgment, [Doc. No. 119], is denied.

**IT IS FURTHER ORDERED** that the claims against Defendants in their

official capacities are dismissed.

Dated this 10th  day of November, 2011.


_____

HENRY EDWARD AUTREY
UNITED STATES DISTRICT JUDGE

- 27 -